[No. 16151. Department One. May 16, 1921.]

PACIFIC COMMERCIAL COMPANY, *Respondent*, v. NORTH-
WESTERN FISHERIES COMPANY, *Appellant*.[1]

SALES (164)—REMEDIES OF BUYER—DAMAGES—EVIDENCE—ADMISSI-
BILITY. In an action by a buyer of canned salmon for damages
under a written contract providing for shipment by steamer to
Manila, upon an issue of mutual mistake in the steamer provision
and waiver of such provision by the seller, evidence that the seller
knew there was a scarcity of space on steamers for Manila owing
to war conditions, and that the seller delivered the fish to a sail-
ing vessel for shipment, accepting bills of lading therefor without
any protest, was properly submitted to the jury.

PLEADING (109)—AMENDMENT—CONDITION OF CAUSE AND TIME FOR.
Trial amendment of a complaint following the impaneling a jury
was not error, where the jury was discharged and the case post-
poned in order to give the defendant time to meet the changed plea.

SALES (166)—REMEDIES OF BUYER—DAMAGES—INSTRUCTIONS. In an
action for damages for the bad condition of a shipment of salmon,
discovered after arrival at Manila, it was not error for the court
to instruct the jury that the purchaser would be entitled to recover,
if such condition of the fish was not the result of being shipped
in a sailing vessel instead of by steamer as the contract provided,
since the purchaser's breach in shipping by sailing vessel would not
defeat the recovery if the bad condition of the fish was due to
defective canning instead of mode of shipment.

SAME (157)—REMEDIES OF BUYER—EVIDENCE—QUESTION FOR JURY.
A contract of sale of canned salmon providing that the exact loss
for blown, puffed or swelled tins should be established by "inde-
pendent survey", contemplated an examination of the shipment
on arrival at destination by an unbiased and competent person,
and the testimony of the surveyor as to his qualifications was suffi-
cient to carry the question to the jury.

SAME (178)—ACTION FOR BREACH—EVIDENCE—ADMISSIBILITY. Un-
der a contract of sale of canned salmon allowing recoupment if more
than one per cent of the cans were "blown, puffed or swollen" on ar-
rival at port of destination, testimony by an independent surveyor
showing the number of cans containing bad or partially decomposed
fish, was properly addressed to the issue of the quantity of "blown,
puffed or swollen."

[1]Reported in 197 Pac. 930.

SALES (36)—CONSTRUCTION—INSPECTION AND APPROVAL. A contract for the sale and shipment of canned salmon providing for the seller's liability for such cans as were found blown, puffed or swollen "on receipt thereof at Manila," contemplated the time of delivery to purchaser at the port and not the time of arrival of the vessel at Manila; hence the purchaser would not be chargeable with the delay of the vessel in discharging cargo, but would be entitled to a reasonable time after receiving the shipment to examine into its condition.

APPEAL (456)—HARMLESS ERROR—ERROR CURED BY INSTRUCTIONS. In an action for damages on the sale of a quantity of canned salmon, many cans of which were found in bad condition, more than half being rejected by an independent surveyor in accordance with the terms of the contract, the admission of evidence that practically all of the remainder of the salmon had been destroyed by the health authorities as unfit for consumption, though erroneous and not expressly taken from the jury, was cured by the court's instruction that the plaintiff could not recover more than the purchase price of the cases rejected by the surveyor.

TRIAL—VERDICT—ADVISORY VERDICT. Though the reformation of a contract for mutual mistake may be one of equitable cognizance, the court would have a right to submit it to the jury in an action for damages and receive and act upon the verdict as advisory.

Appeal from a judgment of the superior court for King county, Hall, J., entered May 29, 1920, upon the verdict of a jury rendered in favor of the plaintiff, in an action on contract. Affirmed.

*Kerr, McCord & Ivey* and *Bogle, Merritt & Bogle,* for appellant.

*Ballinger, Battle, Hulbert & Shorts,* for respondent.

BRIDGES, J.—The parties to this action entered into the following written contract:

"Kelley-Clarke Company,
"Seattle, Washington,
"No. 795-C.                    February 19, 1918.
"KELLEY - CLARKE  COMPANY  of  Seattle, Washington, have this day sold for account of the

Northwestern Fisheries Company and the Pacific Commercial Company, of San Francisco, Calif., have this day bought: ·

"Five thousand (5,000) cases, each containing four (4) dozen full weight one (1) pound tall cans of Alaska Chum Salmon under the following labels:

    3,200 under Niagara,
    1,800 under Trolling,

at one dollar and sixty cents ($1.60) per dozen, ex warehouse, Seattle.

"Terms: Sight draft, documents attached, less 1½% and 2½% on ex warehouse value.

"Claims: That sellers shall deduct from invoices one-half of one per cent (½ of 1%) in full settlement of all claims for blown, puffed or swelled tins, such deduction being agreed upon between parties hereto as a reasonable allowance for loss through these causes—provided, however, if the amount of blows, puffs and swells in any shipment on receipt thereof at Manila exceeds one per cent (1%) and such loss is not directly traceable to exceptional and unusual conditions in transit, in such case sellers will make good actual loss in excess of one-half of one per cent (½of 1%); provided, however, the exact loss is established by independent survey.

"Quality: Buyers to inspect salmon tendered them at Seattle for final acceptance or rejection. Responsibility of seller ceases after tender has been accepted, or if buyers fail to examine before shipment.·

"Shipment: At buyer's risk. For shipment via steamer sailing sometime this week or first of next week. In case goods are not moved in seven (7) days from date, Kelley-Clarke Co. are at liberty to attach warehouse receipt to sight draft on Pacific Commercial Co. of San Francisco.

"Mark, P. C. C. Manila.

> "(Signed) Kelley-Clarke Co.,
> (Selling Agent.)
> "By R. E. Small,
> "Pacific Commercial Co.
> "By H. Goddard.''

As we look at it, the important features of this contract, in so far as they affect this case, are as follows: The defendant sold to the plaintiff 5,000 cases of canned salmon at certain prices, ex-warehouse, Seattle. The fish were to be shipped from Seattle to Manila by steamer, leaving Seattle within a week, and if upon the arrival of the fish at Manila the blown, puffed or swelled cans exceeded one per cent of the total shipment, the seller would become liable to the purchaser for the actual loss in excess of one-half of one per cent: *Provided,* the loss on account of such defective cans was not directly traceable to exceptional and unusual conditions in transit, and provided such loss be ascertained by an independent survey. The seller was to be permitted to attach bills of lading to a sight draft drawn on the purchaser and thus obtain its money, but if the fish should not be shipped within seven days from the date of the contract, then the seller was to be permitted to attach a sight draft drawn against the purchaser, to warehouse receipts and thus obtain its pay. The complaint alleged that the fish were shipped from Seattle on a sailing vessel, and that when they arrived at Manila practically all of the cans were blown, puffed or swelled and were valueless, which condition, it was alleged, was not the result of exceptional or unusual conditions in transit or the time or manner of shipment, but was the result of improper canning.

At the commencement of the trial, by permission of the court, the complaint was amended to allege that the provision in the contract for shipment by steamer was a mutual mistake of the contracting parties, and that by its conduct the defendant had waived the contract provision concerning shipment by steamer. The answer was substantially a general denial. The court submitted to the jury, under instructions, the question

whether the provision in the contract concerning shipment by steamer was a mutual mistake of the contracting parties and whether, in the event there was no mutual mistake, the defendant by its conduct, or otherwise, had waived the provision in the contract concerning shipment by steamer. The court further instructed the jury, that even if it believed there had not been a mutual mistake about the shipment by steamer, and that the defendant had not waived that provision of the contract, still, the plaintiff would be entitled to recover for the loss on account of puffs, swells and blows if it established, by a fair preponderance of the evidence, that such puffs, swells and blows were not caused by the salmon being shipped on the sailing vessel leaving Seattle at a date later than that mentioned in the contract, or because of exceptional or unusual conditions in transit. There was a verdict for the plaintiff for a sum in excess of $17,000. The defendant's motions for nonsuit, for judgment notwithstanding the verdict and for a new trial were denied, and judgment was entered on the verdict, from which the defendant has appealed.

There was ample testimony upon which the jury might have concluded that the defective cans of fish, found upon the arrival of the vessel at Manila, were due to defective canning and not to the manner and time of, or delay in, shipment. Under the instructions given by the court, the jury might have returned its verdict for the respondent on the theory that, under the terms of the contract, the fish were to be shipped on a sailing vessel, rather than by steamer, or that the appellant had consented to the shipment by sailing vessel, thereby waiving the provision of the contract for shipment by steamer, or on the theory that there had been no mutual mistake or waiver about the ship-

ment by steamer, and that the loss was traceable not to the time or manner of shipment, but to defective canning.

Some of the outstanding facts regarding the shipment are that the fish were loaded on the sailing vessel February 26, after which it called at two other ports to take on further cargo, and did not get out of Puget Sound till April 26; that it was loaded in part with lumber; that it did not reach Manila till July 23d; that for some reason the cargo was not discharged for a month or more after it arrived at Manila; that all told the salmon was on the vessel for nearly seven months; that if it had been shipped by steamer, it should, in the usual course of events, have arrived in Manila in something more than a month after sailing from Puget Sound.

Although the briefs are extensive and have taken a very wide range, it seems to us that there are but two important questions in the case, which are, first, was there any testimony from which the jury would be justified in concluding that the provision with reference to shipment by steamer was a mutual mistake, or, if not, that it was waived by the appellant; and, second, if there were not such mutual mistake or waiver, then is the plaintiff entitled to recover on convincing the jury that the shipment on a sailing vessel, and the delay incident thereto, was not the cause of the cans of fish being blown, swelled or puffed when they arrived at Manila.

On the first question, the facts are in substance as follows: Before this contract was entered into, the barque "L'Avenir" was lying alongside pier 14 at Seattle. The respondent learned that the vessel had space for about 5,000 cases of fish. It at once engaged that space. It then went into the market at Seattle to purchase the necessary fish. These it obtained from

the appellant under the contract we have quoted above. The appellant's fish was at the time in one of the warehouses belonging to the port of the city of Seattle. As soon as the purchase of the fish had been made, and probably before the formal contract had been signed by both parties, the respondent directed appellant to load its fish out of the warehouse where it was, into a freight car, and take the same to pier 14 to be loaded upon the barque "L'Avenir." Appellant complied with this request. After the fish were aboard the vessel, the master issued bills of lading and delivered them to the appellant, who attached to them a sight draft drawn against respondent at San Francisco, and thus obtained pay for its fish. There was also some testimony tending to show that at the time in question space aboard steamers sailing from Seattle to Manila was hard to obtain, which fact was known to both the parties to this action. After the fish were loaded, the master of the vessel for the first time learned that he had aboard 4,944 cases of salmon instead of 5,000, the amount called for in the contract. On this account he refused to issue a clean bill of lading until the appellant had given the vessel a guarantee protecting it in this regard, which was done. The first question, therefore, is whether, under this testimony, the court was justified in submitting to the jury the questions, whether the provision in the contract for shipment by steamer was a mutual mistake, and if not, whether appellant had waived the shipment by steamer and consented to the shipment on a sailing vessel.

Waiver cannot be based solely upon knowledge of the facts; there must be an intention to waive.

"According to the generally accepted definition a waiver is the intentional relinquishment of a known right. It is a voluntary act, and implies an election by the party to dispense with something of value, or to

forego some advantage which he might at his option have demanded and insisted on." 27 R. C. L. 904.

"A waiver must be clearly proved, but this may be effected by various species of evidence. Thus it may be proved by express declaration or agreement, or by acts and conduct manifesting an intent and purpose not to claim the supposed advantage, or by so neglecting and failing to act as to induce a belief that it was the intention and purpose to waive." 27 R. C. L. 910.

That the appellant knew that this fish was to be, and was being, shipped on a sailing vessel there cannot be any doubt, because it was told that the shipment would be so made, and because it actually took the fish to the tackle of the barque upon which it was to be loaded, and because it saw it being loaded on that boat, and accepted bills of lading from its shipmaster. But appellant contends that these facts, while they show knowledge on its part, do not indicate its consent to the shipment on the sailing vessel. It is argued that the respondent had the right to ship in any way it saw fit, or, for that matter, to let the fish remain in the Seattle warehouse; that the appellant had no control over the shipment or disposal of the fish; that when it took the fish to pier 14 to be loaded on the sailing vessel, it was but complying with a request which the respondent had a right to make. This argument is persuasive and should have been, and doubtless was, duly considered by the jury. But the jury had a right to take into consideration not only the knowledge but the acts and conduct of the appellant. It had a right to consider whether the failure of appellant to protest against shipment on a sailing vessel, or whether its failure to advise respondent that such a shipment would violate the contract, amounted to a waiver. Often the failure to speak when there is an opportunity so to do, is the strongest proof of waiver or estoppel.

If it was not satisfactory that the fish be shipped on a sailing vessel instead of a steamer, the appellant had more than ample opportunity to so inform the respondent and to protest. The testimony showed that the appellant actually removed the fish from its warehouse and took it to pier 14, knowing that this was being done in order that the shipment might be made on the "L'Avenir"; there was testimony tending to show that on account of war conditions space on steamers sailing for Manila was scarce and that appellant knew this. All these things the jury had a right to consider. Whether there has been a waiver is always a question of fact to be determined by the jury, and under the evidence in this case, we cannot say that there was no material testimony upon which the question of waiver could be submitted to the jury. We therefore conclude that the court properly submitted to the jury the question of mutual mistake in the contract and the question of waiver.

But, in this connection, appellant complains because the court permitted the complaint to be amended. We do not think there is any ground for complaint. The amendment was made following the impanelling of the first jury to try the case. At that time and at appellant's request, the jury was discharged and the trial of the case postponed in order that it might have time to meet the changed plea. Nor have we any doubt of the right of the court to permit the amendment to be made. Parol proof, tending to show mutual mistake in a written contract, or tending to show waiver of certain provisions in such contract, is not violative of the statute of frauds.

But the trial court instructed the jury that, even if there had been no mutual mistake and there had been no waiver, and even if the appellant was entitled to

rely upon the contract just as written, yet the respondent would be entitled to recover if the jury were convinced that the bad condition of the fish, when it arrived at Manila, was not traceable to exceptional or unusual conditions in transit, and was not the result of being shipped in a sailing vessel in the manner this shipment was made, instead of being shipped on a steamer as provided by the contract. In other words, the jury was given to understand that respondent could recover notwithstanding its breach of the contract provision concerning shipment by steamer, if such breach had nothing to do with the loss.

The idea presented by this instruction is vigorously attacked by appellant from many sides. Its general position is that respondent cannot breach the contract in an important feature and yet recover damages; that, if it would seek recovery under the contract, it must have complied with its terms. We cannot accept this view. If respondent's breach of the contract to ship by steamer had nothing to do with, and did not cause, any of the loss or damage, why should it be denied recovery because of such breach? The jury was expressly instructed that if the damage resulted because of the failure to ship by steamer, as provided in the contract, then the plaintiff could not recover. The jury, upon such instruction, found for the plaintiff. In order to have so done, it must have concluded that the shipment by the sailing vessel, instead of the steamer, had nothing to do with the condition of the fish when it arrived at Manila. We believe it should not be, and is not, the law that the respondent should be denied damages simply because it may have violated its contract in a particular which had nothing whatever to do with causing the damage or loss. When the case is stripped of its technicalities and refinements, the

only thing left to it is whether the bad condition of the fish at Manila was caused by defective canning, or, by the fact that it was shipped on a sailing boat in the manner shown by the testimony. If the former be the cause of the loss, the appellant should make good; if the damage was the result of the manner of shipment, then the respondent should stand the loss. We are, therefore, convinced that the case in these particulars was properly submitted to the jury and that the complaint, without amendment, stated a cause of action.

The appellant contends that there was no independent survey of the fish when it arrived at Manila, as provided by the contract. That instrument provided that "the exact loss" should be "established by independent survey." Doubtless this provision contemplated that when the fish arrived at Manila some unbiased and reasonably competent person should make an examination to determine its condition. The testimony shows that as soon as the vessel was ready to discharge its cargo at Manila, one Nelson was called upon to make this examination. His testimony tended to show that he was an independent surveyor of boats and their cargoes, and that he had followed that business in Manila for a number of years, and that prior to this occasion he had inspected and passed upon quantities of canned salmon which had been shipped to Manila. On this question the court instructed the jury as follows:

"You are instructed that the meaning of the words 'independent surveyor' contained in the contract is an examination fully made of the salmon upon its arrival at Manila by a competent, qualified, impartial and disinterested person for the purpose of determining its condition or the damage thereto. . . . The burden is on the plaintiff to show by a fair preponderance of the evidence that an independent survey of this salmon

was made upon receipt thereof at Manila, and that the exact loss was established by the survey."

We have no doubt there was plenty of testimony on which to submit the case to the jury on the question whether Mr. Nelson was a reasonably competent and unbiased surveyor.

It will be remembered that the contract provided that the appellant would make good the "blown, puffed or swollen cans" of fish. It contends that the testimony of the surveyor shows the number of cans which contained bad or partially decomposed fish, as distinguished from cans which were puffed or swollen or blown, and consequently there was no testimony upon which the jury could determine the amount of damage. We believe appellant's argument in this regard is too technical. The testimony shows, and common knowledge teaches us, that a puffed, swollen or blown can of fish indicates a can of bad fish or fish which is not fit for human consumption.

The appellant further contends that the contract provides that it will become liable for such cans as were blown, puffed or swollen upon arrival at Manila, and not at some period subsequent to arrival. The testimony shows that the vessel arrived in Manila harbor something like a month before it commenced discharging its cargo. It does not appear why this delay occurred. Respondent undertook to make this showing but the court did not permit it. In any event, respondent's representative went on board the vessel at once after its arrival, and it did everything it could to have this salmon unloaded at once. If there were unnecessary delays in so doing, it was not the fault of respondent. Besides this, when the contract speaks of "arrival at Manila," it unquestionably means the arrival of the fish at Manila, and not the arrival of the

boat·in the harbor of Manila.  It would be quite impossible for a reasonable examination of the fish to be made until after it had been unloaded from·the vessel. ·The testimony further showed that the surveyor opened several cases of salmon while the fish was on the ship and found a number of cans in those cases to be in bad condition.  He then ordered all the salmon out of the vessel, to be taken to the respondent's warehouses, there to be reconditioned, that is, the good segregated from the bad.  This process of reconditioning consumed a considerable period of time.  On this question the court instructed the jury that the respondent

"was entitled to a reasonable time within which to ·have an independent survey made of the fish after receipt of the fish by plaintiff at Manila, and in determining what is a reasonable time you may take into consideration all the facts and circumstances, the amount of fish to be examined, condition in which it was, and all surrounding facts and circumstances."

We think this whole question was properly submitted to the jury by this instruction.

The reports of Nelson, the independent surveyor, showed that he rejected 2,527 cases of the salmon. Over appellant's objection, the court permitted testimony tending to show that the health authorities of the city of Manila determined that all, or practically all, of the remainder of this salmon was in bad condition and unfit for consumption, and caused it to be destroyed.  This testimony was offered and received with the idea in view that an examination by such health authorities would comply with the provision of the contract with reference to independent survey.  Later, however, the court told the jury that respondent could recover only for the number of cases rejected by Nelson, the independent surveyor.  The appellant now

claims that the introduction of this testimony was prejudicial to it. We cannot think it was. It is a very common thing for trial courts to receive testimony and later, after concluding that it was wrongly received, instruct the jury to disregard it. If the trial court cannot correct its errors in this regard, and if we must reverse a case simply because improper testimony has been received but later taken from the consideration of the jury, then the trial of cases and the progress of justice in the courts will be greatly hampered. Of course, in those instances where we are convinced that the wrongful receipt of testimony has so prejudiced the case as that the instructions to the jury cannot cure such prejudice, we ought to, and will, reverse on that ground; but we cannot see that the appellant has been prejudiced by the receipt of this objectionable testimony. Appellant says the court did not expressly take this testimony from the jury or tell it to disregard it. That appears to be true. But when the court instructed the jury respondent could not, in any event, recover more than the purchase price of the cases rejected by the surveyor Nelson, to wit, 2,527 cases, he, in effect, withdrew from the consideration of the jury all testimony concerning the condition and destruction of the remainder of the fish.

The appellant contends further, that the court erred in submitting to the jury the question whether there had been a mutual mistake in inserting in the contract that the shipment of the fish should be by steamer. The argument is that this portion of the action was to reform the written contract to make it express the intention of the parties, and that such an action is one purely in equity, and that it was for the court to determine whether the contract should be reformed, and that the jury could not rightfully have anything to do

with that question. It must be remembered, however, that in this state the difference in the forms of action in law and equity have been abolished. This was a suit for damages, and was a law action in all of its principal parts. The mere fact that the respondent, as an incident to the action, sought to reform the contract, could not transfer the action from one at law to one in equity. What this court said in the case of *Reynolds v. Canton Ins. Office, Ltd.,* 98 Wash. 425, 167 Pac. 1115, is entirely applicable to this discussion. But if this position were not sound, still, the judgment in the case is that of the court. In any event, it would have a right to submit this question of reformation to the jury, receiving its verdict as an advisory one, and from that viewpoint it is plain that the court, having entered judgment, adopted the verdict of the jury in this regard.

Many specific assignments of error are made and argued based on instructions given and instructions requested and refused. For the most part, what we have already said will be sufficient to answer these assignments of error. There are, also, assignments based on the admission of testimony. We have carefully examined all of the assignments which we have not particularly discussed. This opinion has already reached such length as to make it impossible for us to discuss the additional assignments of error in detail. It must suffice for us to say that we do not find any material merit in them.

The testimony is in very great conflict as to whether the damaged condition of the fish was the result of the manner of shipment and the delay incident thereto, or the result of improper canning. Whatever might be our individual opinion in this regard would be immaterial, because the matter was fully submitted to the

jury, which is the trier of the facts in a case of this character.

The judgment is affirmed.

PARKER, C. J., FULLERTON, HOLCOMB, and MACKINTOSH, JJ., concur.